IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BAKKEN CONTRACTING, LLC, d/b/a<br>BC Contracting,<br><br>              Plaintiff(s),<br><br>     vs.<br><br>THE VENUE AT WERNER PARK, LLC,<br><br>             Defendant/Third-Party Plaintiff,<br><br>     vs.<br><br>WESTERN SURETY COMPANY,<br><br>             Third-Party Defendant.<br><br>BAKKEN CONTRACTING, LLC, d/b/a<br>BC Contracting,<br><br>             Third-Party Plaintiff,<br><br>     vs.<br><br>SEAN NEGUS CONSTRUCTION, LLC; R2<br>PLUMBING, LLC; GRAND RAPIDS<br>POURED WALLS, INC., d/b/a Cherry Valley<br>Concrete; and MAHONEY FIRE SPRINKLER,<br>INC.,<br><br>             Third-Party Defendants | **8:21CV269**<br><br><br><br><br>**MEMORANDUM AND ORDER<br>REGARDING MOTIONS FOR<br>SUMMARY JUDGMENT** |

      This litigation originated as a lawsuit by a contractor to recover the remaining payment allegedly due from a developer for construction of an apartment complex and related structures in Papillion, Nebraska. It now embroils many more parties, counterclaims, crossclaims, and third-party claims. This case is now before the Court on three motions for summary judgment or partial summary judgment on various claims. One motion is the developer's request for summary

1

judgment on three of its five counterclaims against the contractor and on the developer's third-party claim against the bond company for the project. Filing 166. The other two motions are by subcontractors requesting summary judgment on the contractor's third-party claims against them and, as to one of the subcontractors, on its crossclaim against the bond company for the project. Filing 165; Filing 170. The developer's Motion is denied, but the subcontractors' Motions are both granted.

## I. INTRODUCTION

### A. Factual Background

The facts and the factual disputes relevant to each of the motions are best set out in relation to those motions. Consequently, the factual background presented here provides only more general context for all the claims at issue. This general context is drawn primarily from the parties' various statements of facts and involves only facts that are undisputed, unless indicated otherwise.[1]

Plaintiff Bakken Contracting, LLC, d/b/a BC Contracting (BCC), is a limited liability company organized and existing under the laws of the state of North Dakota with its principal place of business in Fargo, North Dakota. Filing 168 at 2 (¶ 2). Defendant The Venue is a limited liability company organized and existing under the laws of the state of Wyoming with its principal place of business in Austin, Texas. Filing 168 at 2 (¶ 1). On August 21, 2018, The

---

[1] Some of the motions, oppositions, and replies now before the Court do not comply with the version of NECivR 56.1 in force since December 1, 2022, *inter alia* because they did not include separate statements of facts or separate responses to statements of fact. However, even though the various deficiencies caused the Court considerable inconvenience, the Court has not required the offending parties to correct the deficiencies because the opposing parties were apparently able to respond effectively. Nevertheless, the Court reminds all practitioners in this Court—longstanding, new, or pro hac vice—to use up-to-date versions of the local rules to facilitate the efficient disposition of motions and cases. There really is no excuse for failure to use the current versions of the local rules when they are available on the Court's website. *See* https://www.ned.uscourts.gov/attorney/local-rules. Future noncompliance with applicable local rules in this case may result in denial of motions or other appropriate action by the Court.

Venue and BCC entered into a construction contract (the Contract) for BCC's construction of an apartment complex located at 120th Street and Ballpark Way in Papillion, Sarpy County, Nebraska, known as The Venue at Werner Park (the Project), financed through the United States Department of Housing and Urban Development. Filing 168 at 2 (¶ 4). The Project contains several apartment buildings, a community area, a parking lot with drive lanes, and various other surrounding structures and landscaping. Filing 168 at 2 (¶ 4).

Western Surety Company (Western) is a corporation organized and existing under the laws of the state of South Dakota and doing business within the State of Nebraska. Filing 168 at 2 (¶ 3). On August 21, 2018, Western issued Bond No. 30035690 (the Bond) comprised of a performance bond and a payment bond in the amount of $21,122,904.00, in part performance of the Contract between The Venue and BCC. Filing 168 at 2–3 (¶ 5).

To complete its work on the Project, BCC hired various subcontractors. Filing 168 at 3 (¶ 7). One such subcontractor was Sean Negus Construction, LLC, (SNC). BCC alleges, and SNC admits, that SNC is organized under the laws of the state of Nebraska and maintains its principal place of business in Omaha, Nebraska. Filing 45 at 2 (¶ 2); Filing 72 at 2 (¶ 2). In a contract dated September 6, 2018, SNC agreed with BCC to perform work on the Project generally described as site clearing, demolition, mass excavation, earth work, site utilities, rough grading, and fine grading. Filing 165-1 at 4 (¶ 6); *see also* Filing 165-1 at 5 (¶ 10) ("SNC contracted with BCC to perform the grading operations for the project and for the installation of site utilities. . . ."). Another subcontractor was Mahoney Fire Sprinkler, Inc., (MFS), which is incorporated in the state of Nebraska and has its principal place of business in Omaha, Nebraska. Filing 173 at 2 (¶ 5). On September 28, 2018, BCC issued a Letter of Intent to award Mahoney a subcontract to "supply, design, and install [a] new fire sprinkler system . . . per local and state

3

codes." Filing 173 at 4 (¶ 25). Eventually, on January 11, 2019, BCC and MFS entered into a subcontract agreement including a scope of work that specified installation of a wet fire suppression system. Filing 173 at 6 (¶ 33).

It is safe to say that various problems assailed the Project during and after construction.

## B. Procedural Background

On July 20, 2021, BCC filed the Complaint initiating this lawsuit against The Venue. Filing 1. BCC alleged that, after giving The Venue credit for all payments made, there remains an unpaid balance of $1,098,723.00, which amount is due and owing to BCC. Filing 1 at 2 (¶ 10). Consequently, BCC asserts three causes of action against The Venue. BCC's first cause of action is for breach of contract based on The Venue's alleged failure and refusal to provide payment for the materials and services provided by BCC pursuant to the Contract between them. Filing 1 at 2–3 (¶¶ 11–15). The second cause of action is for violation of the Nebraska Construction Prompt Payment Act, Neb. Rev. Stat. §§ 45-1201–45-1211, for alleged failure and refusal to pay BCC for work performed on the Project within 30 days after receipt of BCC's payment request. Filing 1 at 3 (¶¶ 16–20). The third cause of action is for "restitution/unjust enrichment" alleging that The Venue has avoided paying in full for the material and services that BCC provided and allowing that non-payment to stand would be inequitable and unconscionable. Filing 1 at 3–4 (¶¶ 21–25). BCC's claims against The Venue are not at issue in this ruling, however.

On September 1, 2021, The Venue filed an Answer and Counterclaim denying BCC's claims and asserting five counterclaims. Filing 8. Only the first three counterclaims are at issue in this ruling. The Venue's first counterclaim is for breach of contract, its second is for breach of warranty, and its third is for "defective construction." Filing 8 at 6 (Counterclaim, ¶¶ 7–12), 6–7

4

(Counterclaim, ¶¶ 13–17), and 7–8 (Counterclaim, ¶¶ 18–22).[2] On September 1, 2021, The Venue also filed a Third-Party Complaint against Western that is at issue in this ruling. Filing 10. The Venue's sole cause of action in its Third-Party Complaint is for breach of performance bond, alleging that The Venue is entitled to a remedy against the Bond because of the default of BCC. Filing 10 at 3–4 (¶¶ 11–16).

The next procedural incident of interest in this ruling was BCC's filing on April 20, 2022, of a Third-Party Complaint against third-party defendants SNC, MFS, R2 Plumbing, LLC, and Grand Rapids Poured Walls, Inc., d/b/a Cherry Valley Concrete. Filing 45. BCC's first three causes of action in its Third-Party Complaint are against SNC alleging, respectively, breach of contract, breach of warranty, and indemnity and/or contribution. Filing 45 at 3–5 (¶¶ 15–27). BCC's tenth, eleventh, and twelfth causes of action are against MFS alleging, respectively, breach of contract, breach of warranty, and indemnity and/or contribution. Filing 45 at 8–10 (¶¶ 54–66). On August 1, 2022, SNC filed its Answer and Counterclaim against BCC and a Cross Claim against Western alleging BCC's failure to issue final payment of its retainage plus interest pursuant to the Nebraska Construction Prompt Payment Act and Western's failure to pay SNC's claim. Filing 72 at 6–7 (¶¶ 40–43 and Prayer).

Although there are or were other counterclaims, crossclaims, third-party claims, and interpleader claims at issue in this litigation, they are not at issue in the Motions for Summary Judgment now before the Court. The deadline for motions for summary judgment in this case was April 15, 2024. Filing 139. The Motions now before the Court were all filed at that deadline.

---

[2] The Venue's fourth and fifth counterclaims are not at issue in this ruling. The Venue's fourth cause of action is for misrepresentation, based on BCC allegedly representing and warranting that the work on the Project could be completed for $21,122,904.00, when BCC knew or should have known that its representation of the cost to complete the project was false. Filing 8 at 8 (Counterclaim, ¶¶ 23–27). The Venue's fifth cause of action is for breach of performance bond, alleging that it is entitled to payment on the Bond on the Project based on BCC's failure to correct defective work and to address warranty issues. Filing 8 at 9 (¶¶ 28–32).

The first such Motion now before the Court is SNC's Motion for Summary Judgment on the first three causes of action against it in BCC's Third-Party Complaint for breach of contract, breach of warranty, and indemnity and/or contribution. Filing 165. The second such Motion is The Venue's Motion for Partial Summary Judgment on the first, second, and third causes of action in its Counterclaim against BCC and The Venue's cause of action in its Third-Party Complaint against Western. Filing 166. The last motion now before the Court is the Motion for Summary Judgment by MFS on all causes of action against it (specifically, the tenth, eleventh, and twelfth causes of action) in BCC's Third-Party Complaint for breach of contract, breach of warranty, and indemnity and/or contribution. Filing 170.

## II. LEGAL ANALYSIS

The Court finds it appropriate to consider each of the Motions now before the Court in turn, setting out the facts and the factual disputes relevant to each Motion at the start of the analysis for each Motion. However, the Court will first summarize the standards for summary judgment applicable to all three Motions.

### A. Standards for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides, "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. "A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" Liberty Ins. Corp. v. HNTB Corp., 87 F.4th 886, 888 (8th Cir. 2023) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)); see also Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) ("An issue is genuine if the

evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." (quotations omitted)). "The court determines materiality [of facts] from the substantive law governing the claim"; thus, only "[d]isputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." *Greater St. Louis Constr. Laborers Welfare Fund v. B.F.W. Contracting, LLC*, 76 F.4th 753, 757 (8th Cir. 2023) (quoting *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998)).

Both the moving and the non-moving party must support their assertions about the presence or absence of genuine factual disputes "by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However, the parties otherwise bear different burdens at summary judgment.

"The movant has the initial burden of establishing the basis for the motion by identifying 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Jones v. Wellpath, LLC*, 77 F.4th 658, 662 (8th Cir. 2023) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up)). "[T]he moving party may discharge its burden by 'pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case.'" *Washington v. City of St. Louis, Missouri*, 84 F.4th 770, 773 (8th Cir. 2023) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and citing Fed. R. Civ. P. 56(a)). "The movant is entitled to judgment as a matter of law 'when the [non-moving party] has failed to make a sufficient showing of the existence of an essential element of [its] case." *Whitworth v. Kling*, 90 F.4th 1215, 1217 (8th Cir. 2024) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1074 (8th Cir. 1996)).

In response to a motion for summary judgment, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Jones*, 77 F.4th at 662–63 (quoting *Torgerson*, 643 F.3d at 1042). Even though a "party's own testimony is often self-serving," that alone is not grounds for disregarding it entirely as the basis for a genuine issue of material fact. *Hall v. Higgins*, 77 F.4th 1171, 1182 (8th Cir. 2023) (citing *Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013)). On the other hand, "[m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Jones*, 77 F.4th at 663 (quoting *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007)). Similarly, "[t]o create a genuine dispute of fact, 'the mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Johnson v. Midwest Div. - RBH, LLC*, 88 F.4th 731, 736 (8th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

In deciding a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[A]t summary judgment, it is not the role of the district court to weigh competing evidence or 'attempt to discern the truth of any factual issue.'" *Hall*, 77 F.4th at 1182 (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008)). "Genuine disputes of material fact are for a factfinder to resolve." *Liberty Ins. Corp.*, 87 F.4th at 889. Instead, "[s]ummary judgment is available when there is 'no genuine issue of material fact' and 'the evidence, viewed in a light most favorable to the nonmoving party, shows . . . the [moving party] is entitled to judgment as a matter of law.'" *Liberty Ins. Corp.*, 87 F.4th at 888 (quoting *Bharadwaj v. Mid Dakota Clinic*,

954 F.3d 1130, 1134 (8th Cir. 2020)); *Nieters v. Holtan*, 83 F.4th 1099, 1105 (8th Cir. 2023) ("Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute [as to] those facts." *Johnson*, 88 F.4th at 736 (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)).

### B.  The Venue's Motion

The Court finds it appropriate to begin its analysis with The Venue's Motion for Partial Summary Judgment, Filing 166, because it is the motion involving the original parties to this litigation as well as the bond company for the Project. The Venue seeks summary judgment against BCC on three of The Venue's counterclaims. The Venue's first counterclaim is for breach of contract alleging that BCC failed to construct the Project in accordance with the drawings and specifications and other construction documents and failed to timely complete the Project. Filing 8 at 6 (Counterclaim, ¶¶ 7–12). The Venue's second counterclaim is for breach of warranty alleging that BCC breached its warranties that materials provided are consistent with the drawings and specifications and other construction documents and that the construction would be built in a reasonably good and workmanlike manner free from defective materials. Filing 8 at 6–7 (Counterclaim, ¶¶ 13–17). The Venue's third cause of action is for "defective construction" specifically alleging, but not limiting the cause of action to, nine defective and incomplete items that BCC failed to cure. Filing 8 at 7–8 (Counterclaim, ¶¶ 18–22). The Venue also seeks summary judgment on The Venue's sole cause of action in its Third-Party Complaint against Western for breach of the performance bond, alleging that The Venue is entitled to a

remedy against the Bond because of the default of BCC. Filing 10 at 3–4 (¶¶ 11–16). The Court begins its analysis of The Venue's Motion with a statement of additional relevant facts. Unless indicated otherwise, the facts set out here are undisputed.

      1.  *Additional Factual Background*

          a.  Nonconforming and Defective Plumbing

As a part of the Contract between The Venue and BCC, BCC specifically agreed to furnish all materials and to perform all its work on the Project as shown on and in accordance with all drawings and specifications and to correct any defects due to faulty materials or workmanship that it provided on the Project. Filing 168 at 3 (¶ 6). The Venue has designated John B. Wilhelmi as its expert witness concerning allegedly defective plumbing work on the Project. Filing 168 at 5 (¶ 13). The Venue initially requested that Mr. Wilhelmi inspect the visible portions of the Project's plumbing, including all the bathroom fixtures at the Project. Filing 168 at 5 (¶ 15). Mr. Wilhelmi opines that although the Contract's drawings and specifications for the Project required BCC and its subcontractors to install toilets with an elongated bowl in each of the bathrooms, BCC and/or its subcontractor installed toilets with a shorter, round bowl at a discounted price. Filing 168 at 5 (¶ 15). Mr. Wilhelmi opines that BCC could not identify anywhere in the Project's documents where such savings were passed on to The Venue. Filing 168 at 5 (¶ 15). The Venue alleges that Mr. Wilhelmi initially estimated the cost of replacing the round toilet bowls with the elongated toilet bowls required under the Contract's plans and specification to be $106,000.00, but that he later revised that estimate to be $131,944.99. Filing 168 at 6 (¶¶ 16–17).

BCC and Western dispute Mr. Wilhelmi's opinions. Specifically, Western and BCC assert that Mr. Wilhelmi testified that he was unaware of the communications between the Venue

and BCC regarding so-called "Value Engineering" changes, including the change to round toilets, and Western and BCC contend further that the toilets that were installed worked as designed. Filing 176 at 2 (¶ 15); Filing 181 at 3 (¶ 15). Indeed, Western and BCC allege that the change in plumbing fixtures was noted in the Value Engineering Summary, which was accepted by The Venue, and that the toilet bowls that were installed were reviewed and approved by MEP Delta Design (MEP Delta), which Western and BCC identify as The Venue's "design team." Filing 176 at 2–3 (¶ 15); Filing 181 at 3 (¶ 15). Western and BCC deny the accuracy of Mr. Wilhelmi's estimates because they are based on total replacement of the toilets rather than the difference in value between the toilets installed and the toilets that Mr. Wilhelmi contends were required. Filing 176 at 3 (¶¶ 16–17); Filing 181 at 3 (¶¶ 16–17). They also point out that Mr. Wilhelmi testified in deposition that the toilets installed worked as designed. Filing 176 at 3 (¶¶ 16–17); Filing 181 at 3 (¶¶ 16–17).

The Venue alleges—and neither Western nor BCC disputes—that upon discovery of a blocked sanitary sewer waste line in apartment 618 at the Project, The Venue requested that Mr. Wilhelmi inspect the Project's plumbing, which was previously buried and not visible, but which had become visible as a result of efforts to locate, dig up, and repair the sanitary sewer waste line blockage. Filing 168 at 6 (¶ 18). The Venue alleges—and again, neither Western nor BCC disputes—that upon Mr. Wilhelmi's inspection of such previously buried portions of the Project's plumbing, Mr. Wilhelmi noted that two separate portions of the sanitary sewer waste line, which should have been tied together into another drain with a three-way fitting, were instead installed completely separate from one another. Filing 168 at 6 (¶ 19). That is, The Venue alleges that one line tied into the drain line with an elbow joint and the other line was simply left open to drain into the ground, even though the two sanitary sewer waste lines were so close to

11

each other that working on one would require working around the other. Filing 168 at 6 (¶ 19). The Venue alleges that it was this line left open to drain into the ground that had caused the blocked sanitary sewer waste line in apartment 618. Filing 168 at 6 (¶ 19).

The parties dispute the requirements and costs following discovery and repair of this blocked sanitary sewer waste line. The Venue alleges that Mr. Wilhelmi opined that it was necessary to run a video line through the remaining buried portion of the Project's underground sanitary sewer system to find and repair any additional nonconforming and defective plumbing work. Filing 168 at 7 (¶ 20). Western and BCC dispute the necessity of running a video line through the Project because they contend that no provision in the contract between BCC and The Venue requires doing so. Filing 176 at 3 (¶ 20); Filing 181 at 4 (¶ 20). They contend further that the issue involving apartment 618 occurred on December 2, 2020, but there have been no additional failures in any other apartments since then. Filing 176 at 3 (¶ 20); Filing 181 at 4 (¶ 20). The Venue alleges that Mr. Wilhelmi initially estimated the cost of inspecting the Project's underground sanitary sewer system by video as well as the inclusion of any necessary repair allowance as totaling $200,000.00, but he later revised that estimate using present day material and labor costs as totaling $264,196.00. Filing 168 at 7 (¶¶ 21–22). Western and BCC reiterate that no contract provision requires such a remedy and that there have been no additional failures. Filing 176 at 3–4 (¶¶ 21–22); Filing 181 at 4 (¶¶ 21–22).

The Venue alleges that the cost to repair BCC's defective and nonconforming plumbing work on the project totals $396,140.99 ($131,944.99 for toilet bowl replacement plus $264,196.00 for video and repair of the underground sanitary sewer system). Filing 168 at 7 (¶ 23). Western and BCC assert that the plumbing work was not "defective and nonconforming" and that any claims for repairs are speculative and nonrecoverable. Filing 176 at 4 (¶ 23); Filing

181 at 4 (¶ 23). Western and BCC also reiterate their other grounds for disputing The Venue's factual allegations. Filing 176 at 4 (¶ 23); Filing 181 at 4 (¶ 23).

b.   "Value Engineering"

Western asserts additional material facts. Specifically, Western alleges that at the request of The Venue, BCC agreed to take a "value engineering" approach to the Project. Filing 176 at 4 (¶ 24). Western alleges that "value engineering" is a systematic and organized approach to providing the necessary functions in a project that lowers costs. Filing 176 at 4 (¶ 25). Thus, Western alleges that as part of the overall value engineering approach, BCC worked to identify different aspects of the Project that could be completed at a lower cost. Filing 176 at 5 (¶ 26). Western alleges that The Venue delegated to its design team, MEP Delta, the responsibility to review submittals identifying specific pieces of equipment that were to be replaced pursuant to value engineering and that all submittals were provided to MEP Delta for approval. Filing 176 at 5 (¶¶ 31–32). Western alleges that those items that could be completed at a lower cost were identified in a Value Engineering Summary. Filing 176 at 5 (¶ 27).

Western alleges that a "VE plumbing fixture package" was provided to MEP Delta and later referenced in the Value Engineering Summary. Filing 176 at 5 (¶ 33). Western alleges that the first item listed on the VE plumbing fixture package is "PR1400T HE TWO PIECE TOILET WHT," and that this item was marked "REVIEWED" by MEP Delta. Filing 176 at 4 (¶¶ 34–35). Western alleges that the product specifications for the PR1400T HE TWO PIECE TOILET WHT" identify it as "1.1-1.6 12 ROUND FRONT UNIVERSAL BOWL WHITE." Filing 176 at 5 (¶ 36). Western alleges that the photograph and measurements included show that the toilet approved by MEP Delta had a round toilet bowl. Filing 176 at 6 (¶ 37).

13

Western alleges that the Value Engineering Summary identifies "Plumbing" and the "VE plumbing fixture package" as the items that were to be modified as part of the value engineering approach. Filing 176 at 5 (¶ 30). Western alleges further that Corbin Graham, a Partner at The Venue, electronically signed the Value Engineering Summary to accept the proposed value engineering modifications to the Project. Filing 176 at 5 (¶ 28). Western also alleges that value engineering changes to the Project would not have been made if Graham had not signed off on the Value Engineering Summary. Filing 176 at 5 (¶ 29).

The Venue does not respond individually to Western's allegations concerning "value engineering." *See generally* Filing 188. Instead, The Venue alleges that there is no reference in the parties' Contract to The Venue's delegation of value engineering authority to MEP Delta. Filing 188 at 3. The Venue alleges further that the submittals showing that BCC intended to use round toilet bowls at the Project does not indicate or identify any approval by MEP Delta. Filing 188 at 3.

    2.   *The Nonconforming Plumbing Work Claims*

        a.   The Parties' Arguments

The Venue argues that, as a part of the Contract, BCC specifically agreed to furnish all materials and to perform all its work on the Project as shown on and in accordance with all Project drawings and specifications and to correct its work on the Project in the event that any of it was defective or nonconforming. Filing 169 at 3. The Venue argues that BCC (and/or its plumbing contractor, R2 Plumbing, LLC (R2)), failed to complete the plumbing work at the Project in accordance with all Project drawings and specifications. Filing 169 at 3. Specifically, The Venue argues that BCC (and/or R2) ordered and installed the wrong toilet bowls throughout the Project. Filing 169 at 3. The Venue argues that BCC's installation of the wrong toilet bowls

14

proximately caused damages to The Venue of not less than $131,944.99. Filing 169 at 3 (arguing that BCC's failure proximately caused damage to the Venue); *see also* Filing 168 at 6 (alleging that the material and labor costs to replace the wrong toilet bowls total $131,944.99). Indeed, The Venue argues that Mr. Wilhelmi's testimony about the nonconforming plumbing work on the Project and the resulting damage is uncontradicted by BCC. Filing 169 at 3.

Western and BCC argue that the allegedly non-conforming toilets were installed as part of the "value engineering" approach to the Project. Filing 178 at 5; Filing 181 at 5. They argue that the round toilets were identified in the Value Engineering Summary and that they were approved by MEP Delta. Filing 178 at 5; Filing 181 at 6. Thus, they assert that the installation of the round toilets was in compliance with the Contract. Filing 181 at 5–6. BCC adds that the applicable measure of damages (if any) is "clearly not complete replacement" but is instead the diminution in value (if any) from having round bowls instead of elongated ones with credit for any salvage. Filing 181 at 6.

In reply, The Venue reiterates that there is no reference to delegation of value engineering authority by The Venue to MEP Delta and no indication that the submittal concerning round toilets was approved by MEP Delta. Filing 188 at 3. The Venue argues further that Western's and BCC's arguments about value engineering show that the industry standard practices were not used, so that BCC's failure to comply with the Contract is not excused. Filing 188 at 3.

      b.  Western and BCC Have Generated a Factual Dispute as to Whether Round Toilets Were Approved by BCC

The Nebraska Supreme Court has explained, "In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty." *Henriksen v.*

15

*Gleason*, 643 N.W.2d 652, 658 (Neb. 2002) (citing *Phipps v. Skyview Farms*, 610 N.W.2d 723 (Neb. 2000)). Similarly, to prevail on a breach-of-warranty claim, the plaintiff must prove the warranty, its breach, the cause of loss, and the extent of damages. *McCoolidge v. Oyvetsky*, 874 N.W.2d 892, 901 (Neb. 2016). Here, the "promise" and the "warranty" are essentially the same: a promise "to construct the Project in accordance with the Drawings and Specifications and other construction documents," Filing 8 at 6 (¶ 8), and a warranty "that material provided are consistent with the Drawings and Specifications and other construction documents," Filing 8 at 6 (¶ 14). Likewise, the "defective construction" counterclaim asserts that BCC "failed to construct the Project in accordance with the Drawings and Specifications and other construction documents," Filing 8 at 7 (¶ 19), although neither nonconforming toilets nor defective sanitary sewer lines are alleged in the non-exclusive list of "defective and incomplete items," Filing 8 at 7 (¶ 21). The Court finds that the dispositive elements here are the "promise" or "warranty" elements and the "breach" elements of the claims; specifically, the question is whether the elongated toilets originally promised in the Contract were in fact replaced by round toilets pursuant to the "value engineering" process.

Western and BCC have done more than simply show that there is some "metaphysical doubt" as to the existence of approval of round toilets pursuant to the "value engineering" process, because they have instead provided "specific facts showing that there is a genuine issue for trial" on that issue. *See Jones*, 77 F.4th at 662–63 (quoting *Torgerson*, 643 F.3d at 1042). They have done so by pointing to the affidavit of Cory Jackson, who was employed with BCC as a Project Manager. *See* Filing 176 at 4–6 (factual allegations based on Jackson's affidavit); Filing 177-1 (Aff. of Jackson). Specifically, Jackson avers that BCC agreed to take a "value engineering" approach to the Project at The Venue's request. Filing 177-1 at 2 (¶ 4). The Venue

16

offers no evidence to dispute that assertion. Jackson avers that the items listed in a Value Engineering Summary, with Corbin Graham's electronic signature as The Venue's representative, on page 1, Filing 177-3 at 1, include a "VE plumbing fixture package" as a "value engineering" item, Filing 177-3 at 7. *See* Filing 177-1 at 2 at 2–3 (¶¶ 5–7). Again, The Venue offers no evidence to dispute that assertion. Jackson also avers that MEP Delta approved the submittal listing "VE plumbing fixture package" including a toilet with a PR1400T HE TWO PIECE TOILET WHT, identified as "ROUND FRONT UNIVERSAL BOWL." Filing 177-1 at 3 (¶¶ 8–11). The record BCC and Western rely on includes a SUBMITTAL/SHOP DRAWING TRANSMITTAL showing these items and showing that Jake Mitchell, a Project Manager for MEP Delta, reviewed them. *See* Filing 177-4 at 2, 6.

The Venue attempts to rebut Western's and BCC's efforts to generate genuine issues of material fact by asserting that there is no reference to delegation of value engineering authority to MEP Delta in the Contract between The Venue and BCC and by asserting that the submittal, Filing 177-4, "does not indicate any approval thereof by MEP Delta." Filing 188 at 3. Even if the parties' Contract does not reference delegation of value engineering authority to MEP Delta, The Venue has not pointed to any language of the Contract barring such delegation. *See Jones*, 77 F.4th at 662 (explaining that the movant has the burden to identify portions of the record demonstrating the absence of a genuine issue of material fact (citing *Torgerson*, 643 F.3d at 1042)). The Venue also has not presented any evidence that MEP Delta was hired for a different purpose or even suggested that MEP Delta did not have a role in the value engineering process. The Venue has disputed only whether MEP Delta "approved" the nonconforming toilets as part of the value engineering process. The Venue also has not rebutted the evidence that Corbin Graham signed the Value Engineering Summary.

A closer question may be presented by The Venue's assertion that the value engineering submittal, Filing 177-4, "does not indicate any approval thereof by MEP Delta." Filing 188 at 3. The submittal clearly shows that it is from MEP Delta to Jackson at BCC, that the plumbing fixtures were "Reviewed" and not "Rejected" by Jake Mitchell, a Project Manager for MEP Delta, as indicated by x marks in the appropriate column of the appropriate row, but it does not show that Mitchell "approved" the fixtures. A reasonable jury could nevertheless conclude that MEP Delta reviewed the change in plumbing fixtures and did not reject them and that Corbin Graham ultimately "approved" them, as indicated by Graham's electronic signature. *See Liberty Ins. Corp.*, 87 F.4th at 888 ("A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" (quoting *Liberty Lobby, In*c., 477 U.S. at 248)).

Similarly, the Court finds unavailing The Venue's argument that BCC failed to follow the industry standard for value engineering so that BCC is not excused from its failure to construct the Project consistent with the Contract's plans and specifications. A reasonable jury could find that The Venue invited BCC to pursue value engineering, set up the process for review by MEP Delta, and acquiesced in the results, where both MEP Delta and Corbin Graham were involved in the approval process. *Id.* The Venue does not dispute that BCC agreed to take a "value engineering" approach to the Project at The Venue's request. Filing 176 at 4 (¶ 24). The Venue has not complained—and cannot now be heard to complain—that the "value engineering" approach was contrary to the drawings and specifications and other construction documents with which BCC was to comply.

Because there is at least a genuine issue of material fact as to whether the parties agreed that round toilets would satisfy the Contract promises, and hence complied with the warranty to conform to the drawings and specification and other construction documents, there is also at least

a genuine issue of material fact on whether there was any breach of the Contract promises or warranty when BCC provided round toilets. *See Henriksen*, 643 N.W.2d at 658 (explaining that proof of a breach-of-contract claim requires *inter alia* proof of a promise and breach of that promise); *McCoolidge*, 874 N.W.2d 901 (explaining that proof of a breach-of-warranty claim requires *inter alia* proof of a warranty and breach of that warranty). Thus, The Venue is not entitled to summary judgment on its breach-of-contract claim or its breach-of-warranty claim against BCC based on allegedly nonconforming plumbing fixtures. Again, nonconforming plumbing fixtures are not expressly identified as construction defects in The Venue's "defective construction" claim, but even to the extent they are included, there are genuine issues of material fact as to that claim as well for precisely the same reasons. *See* Filing 8 at 7–8 (¶¶ 18–22). Thus, The Venue is not entitled to summary judgment on any of its three counterclaims at issue based on nonconforming plumbing fixtures.

### 3. *The Defective Sanitary Sewer Line Claims*

#### a. The Parties' Arguments

The Venue also asserts that BCC (and/or its subcontractor R2) failed to appropriately connect the sanitary sewer waste line. Filing 169 at 3. The Venue also asserts that BCC has refused to correct this construction defect. Filing 169 at 3. The Venue again relies on Mr. Wilhelmi's "uncontradicted" testimony that a video check of the entire sanitary sewer system is required and his estimate that such video check and repairs will cost $264,196.00. Filing 169 at 3; Filing 168 at 8 (¶ 22)) (stating Mr. Wilhelmi's estimate).

Western and BCC respond that BCC paid the cost to remedy the issue with the sanitary sewer line for apartment 618. Filing 178 at 6. Western and BCC assert that there have been no other issues with the sanitary sewer lines over the last three-and-a-half years since the Project

was completed, suggesting this means there is no evidence of other defects. Filing 178 at 6. They assert that The Venue's claim of defective construction of the sewer system is really a claim that The Venue wants BCC to video all the sanitary sewer lines for the Project just in case there might be defects with other lines. Filing 178 at 6. They then argue that The Venue cites no legal authority or provision of the Contract that supports requiring BCC to pay for such an undertaking. Filing 178 at 6.

In reply, The Venue argues that Western's and BCC's argument that the passage of time has reduced the likelihood of a defect to zero is contrary to Mr. Wilhelmi's testimony that "we could have a spot sitting there right now where it's dumping out under somebody's floor [a]nd eventually, who knows how long, it's going to surface someplace." Filing 188 at 4 (citing Filing 167-3 at 21 (Depo. of Wilhelmi, 82:4-83:7)). The Venue also points to evidence that there was no appropriate test of the sanitary sewer lines to ensure that they were appropriately connected. Filing 188 at 5. The Venue then reiterates that its "uncontradicted" expert witness's testimony in this matter necessitates BCC paying the cost of a video inspection of the Project's sanitary sewer system. Filing 188 at 5.

> b.  The Venue Points to Speculation Not Evidence in Attempting to Show the Absence of a Dispute about the Need for a Video Survey of the Sewer System

The Court finds that the dispositive issue on this part of The Venue's Motion for Summary Judgment is that The Venue has failed to meet its initial burden of establishing the basis for the motion by identifying portions of the record demonstrating the absence of a genuine issue of material fact. *See Jones*, 77 F.4th at 662 (stating the movant's burden at summary judgment). It is well-settled that the non-moving party must rely on more than speculation and conjecture and must instead point to evidence to defeat summary judgment. *See, e.g., Solomon v.*

*Petray*, 795 F.3d 777, 788 (8th Cir. 2015) ("As with any summary judgment motion, while we are required to make all reasonable inferences in favor of the non-moving party, we do not resort to speculation." (quoting *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008)). It is equally clear that claims may be proven by circumstantial evidence, but speculation does not qualify as circumstantial evidence. *Lissick v. Anderesen Corp.*, 996 F.3d 876, 883 (8th Cir. 2021). It follows that pointing to mere speculation does not satisfy a movant's burden at summary judgment to establish the absence of a disputed fact. *See Jones*, 77 F.4th at 662.

No reasonable jury could conclude that Mr. Wilhelmi's opinion on this issue is anything but speculative. *See Liberty Ins. Corp.*, 87 F.4th at 888 ("A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248)). Mr. Wilhelmi's testimony was that "we could have a spot sitting there right now where it's dumping out under somebody's floor [a]nd eventually, who knows how long, it's going to surface someplace." Filing 167-3 at 21 (Depo. of Wilhelmi, 82:4-83:7). A statement that the Project "could have" a problem with the sanitary sewer lines is far from an opinion to a reasonable degree of certainty or even an opinion of a likelihood of any further defect. This speculative statement must be contrasted with Western's and BCC's undisputed evidence that there has not been another incident involving a problem with the sanitary sewer system for over three-and-a-half years. Filing 167-3 at 21 (Depo. of Wilhelmi, 84:15–19) (acknowledging that the problem with apartment 618's line was repaired and that no further repairs were required). Furthermore, The Venue has failed to point to any evidence that controlling law or a provision of the Contract requires BCC to pay for a video survey of the entire sanitary sewer system. See generally Filing 168.

21

Thus, The Venue is not entitled to summary judgment on the part of its breach-of-contract claim or its breach-of-warranty claim against BCC based on failure to do a video survey of the entire sanitary sewer system at the Project, because there are genuine issues of material fact as to whether any promise or warranty existed and whether it was breached. *See Henriksen, 643 N.W.2d at 658* (explaining that proof of a breach-of-contract claim requires *inter alia* proof of a promise and breach of that promise); *McCoolidge, 874 N.W.2d 901* (explaining that proof of a breach-of-warranty claim requires *inter alia* proof of a warranty and breach of that warranty). Also, the sanitary sewer system is not expressly identified as a construction defect in The Venue's "defective construction" claim, but even to the extent it is included, there are genuine issues of material fact as to that claim as well for precisely the same reasons. *See Filing 8 at 7*–8 (¶¶ 18–22). Thus, The Venue is not entitled to summary judgment on any of its three counterclaims at issue based on an allegedly defective sanitary sewer system.

### 4. *The Recovery on the Bond*

#### a. The Parties' Arguments

Turning to The Venue's request for summary judgment on its third-party claim against Western for breach of the performance Bond, the Venue argues that Western has failed and refused to honor the performance bond with respect to the defective and nonconforming plumbing work. Filing 169 at 3–4. The Venue argues that interest has continued to accrue on Western's surety obligation since September 1, 2021, pursuant to Neb. Rev. Stat. § 45-104. Filing 169 at 4. The Venue also argues that it is entitled to attorney's fees as a result of Western's failure to pay on the Bond pursuant to Neb. Rev. Stat. § 44-359. Filing 169 at 4.

Relying on the language of paragraph 4 of the Bond, Western argues that for its "obligations" on the performance bond to be "triggered," two things must occur: (1) BCC must

have failed to perform or defaulted on the Contract; and (2)(a) BCC must have failed to fully indemnify The Venue from all costs and damages that The Venue may suffer from such failure, and (b) BCC must have failed to fully reimburse and repay The Venue all expenses that The Venue may incur in making good any such default. Filing 178 at 4. Western argues that because The Venue and BCC disagree about whether nonconforming products were installed, there has been no determination that BCC failed to perform the Contract. Filing 178 at 8. Western argues that The Venue has offered no evidence that it has already done the work to replace the toilet bowls, so BCC has not failed to reimburse The Venue for costs that The Venue incurred as a result of BCC's alleged failure to perform. Filing 178 at 8.

In reply, The Venue contends that Western's argument that it has no obligation under the Bond "is contradictory and defies logic." Filing 188 at 5. The Venue asserts that Western argues that the surety's obligation to the project owner on a bond is exactly the same as the general contractor's obligation to the project owner, but Western then argues that its obligation under the bond arises only when a determination has been made that BCC defaulted or failed to perform the Contract and has refused to pay or reimburse resulting damages after the default is established. Filing 188 at 5. The Venue argues, "Upon entry of any judgment against BCC, a similar judgment may be rendered against Western Surety." Filing 188 at 6.

> b. The Venue Cannot Maintain an Action on the Bond until BCC's Default Is Ascertained and Judgment Against BCC Is Entered

The Nebraska Supreme Court has explained,

> Suretyship is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal. A surety on a performance bond is bound in the manner and to the extent provided in the obligation.

*State ex rel. Wagner v. Gilbane Bldg. Co.*, 757 N.W.2d 194, 200 (Neb. 2008) (citations omitted). As that court had previously stated,

> The surety's obligation is not an original and direct one for the performance of his own act, but is accessory or collateral to the obligation contracted by the principal. It is of the essence of the surety's contract that there be a valid obligation.

*Rodehorst v. Gartner*, 669 N.W.2d at 679, 686 (Neb. 2003) (quoting *Sawyer v. State Surety Co.*, 558 N.W.2d 43, 47 (Neb. 1997), in turn quoting *Niklaus v. Phoenix Indemnity Co.*, 89 N.W.2d 258 (Neb. 1958)). Thus, "[i]n effect the surety undertakes to 'back up' the performance of the debtor and thereby gives the creditor the added assurance of having another party to the obligation." *Id.* (quoting 2 James J. White & Robert S. Summers, Uniform Commercial Code § 16–10 at 105 (4th ed. 1995)). As the Nebraska Supreme Court made clear some time ago, "The liability of the surety for the debt to the holder of the obligation is no greater and no less than that of the principal." *Northern Bank v. Dowd*, 562 N.W.2d 378, 379 (quoting *Sawyer*, 558 N.W.2d at 47, with emphasis added in Dowd). Consequently, "no action may be maintained on a [surety's] bond until the amount due thereon has been ascertained and judgment therefor entered." *Sawyer*, 558 N.W.2d at 47 (quoting *Sherwood v. Merchants Mut. Bonding Co.*, 226 N.W.2d 761, 762 (Neb. 1975)).

The Court concludes that the parties are confusing when a surety is obligated under a performance bond and when an obligee may recover on a performance bond. As Western contends, the fourth paragraph of the Bond provides as follows:

> 4.      If the Contractor performs the Contract and fully indemnifies and saves harmless Obligees from all costs and damages which they may suffer by reason of failure to do so, and fully reimburse and repay Obligees all expenses which any Obligee may incur in making good any such default, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

24

Filing 10-2 at 2. Although Western describes this paragraph as explaining when its "obligations" on the Bond are "triggered," the language of the Bond states instead when Western's "obligations" on the Bond are terminated. Specifically, Western remains obligated on the Bond—its obligations "remain in full force and effect"—until the obligees are indemnified or reimbursed by BCC for any failure of BCC to perform. Of course, if BCC does not perform and does not indemnify or reimburse The Venue for such a failure, then The Venue is entitled to recover against the Bond. Thus, "no action may be maintained on [Western's performance Bond] until the amount due thereon has been ascertained and judgment therefor entered." *Sawyer*, 558 N.W.2d at 47 (quoting *Sherwood*, 226 N.W.2d at 762).

The Venue is correct that Neb. Rev. Stat. § 44-359 provides for an award of attorney's fees in an action to recover on a performance bond. However, that does not mean that Western cannot insist on a determination that BCC has defaulted before paying on the Bond. The Nebraska Supreme Court explained that an award of attorney's fees under § 44-359 is appropriate when "the surety company admitted it had issued the bond [but] it did not admit that [the contractor's] performance under the bond was defective." *Omaha Home for Boys v. Stitt Const. Co.*, 238 N.W.2d 470, 473 (Neb. 1976). The venerable decision in *Omaha Home for Boys* makes clear that a surety, like a contractor, may dispute whether the contractor has failed to perform before the surety must pay on the Bond, just as *Sawyer* makes clear that The Venue cannot properly maintain an action on Western's performance Bond until the amount due on account of BCC's alleged default is ascertained and a judgment against BCC is entered.

In short, because there are genuine issues of material fact precluding summary judgment in The Venue's favor on its claims against BCC, it follows that summary judgment in The Venue's favor on its claim against Western's Bond must also be denied.

25

### C.  SNC's Motion

The Court turns next to SNC's Motion for Summary Judgment, Filing 165, on the causes of action against it in BCC's Third-Party Complaint and on SNC's Counterclaim against BCC. Filing 165. As mentioned in the brief factual summary in § I.A., SNC is the "grading" subcontractor for the Project. *See* Filing 165-1 at 4 (¶ 6) (stating that in a contract dated September 6, 2018, SNC agreed with BCC to perform work on the Project generally described as site clearing, demolition, mass excavation, earth work, site utilities, rough grading, and fine grading); *see also* Filing 165-1 at 5 (¶ 10) ("SNC contracted with BCC to perform the grading operations for the project and for the installation of site utilities. . . ."). BCC's first cause of action against SNC is for breach of contract, alleging that SNC breached the September 6, 2018, subcontract to perform all work associated with site clearing and demolition, mass excavation, earthwork, site utilities, rough grading, and finish grading by failing to timely perform its work "in accordance with the Prime Contract and free from defects." Filing 45 at 3–4 (¶¶ 15–20). BCC's second cause of action against SNC is for breach of warranty, alleging that SNC breached express warranties "that the work will conform to the requirements of the Subcontract Documents and will be free from defects, expect [sic] those inherent in the quality of the Work the Subcontract Documents require or permit," adding that "[w]ork, materials or equipment not conforming to these requirements may be considered defective." Filing 45 at 4 (¶¶ 21–24). BCC's third cause of action against SNC is for "indemnity and/or contribution," alleging that "[i]f and to the extent that [BCC] is determined to be liable to The Venue on The Venue's Counterclaim, [BCC] is entitled to indemnification and/or contribution from SNC due to SNC's obligations under the SNC Subcontract, and in accordance with applicable law." Filing 45 at 5 (¶¶ 25–27). In addition to seeking summary judgment on BCC's third-party claims against it,

SNC also seeks summary judgment on its Counterclaim against BCC for payment of the unpaid balance due of $25,625.11 under the contract between SNC and BCC. Filing 165 at 2. The Court begins its analysis of SNC's Motion with a statement of additional relevant facts. Unless indicated otherwise, the facts set out here are undisputed.

### 1. Additional Factual Background

SNC asserts hat The Venue, as owner of the Project, did not allege in its Answer and Counterclaim against BCC any claim for any defect in the mass grading, fine grading, or utility installation work performed by SNC or any other breach of contract by SNC. Filing 165-1 at 2 (¶ 4), 5 (¶ 12). BCC disputes this allegation by asserting that The Venue alleges breach of contract as well as defective concrete parking and drive lanes, which are further tied to the scope of work by SNC, and that The Venue claims damages for the cost to tear out and replace the parking and drive lanes including an estimated cost of $163,550 for grading. Filing 180 at 2–3 (¶ 4), 3 (¶ 12).

SNC began its operations on the project in September 2018, performing the mass grading operation and site utilities including storm, sanitary, and water lines, but the parties dispute whether SNC's work was performed in conformance with City of Omaha standards. Filing 165-1 at 5 (¶ 11); Filing 180 at 3 (¶ 11). SNC alleges that it substantially completed its work in December of 2019 and presented its final pay application in June 2020, but BCC withheld the application for final payment and that payment remains unpaid by BCC. Filing 165-1 at 5 (¶ 13). SNC also alleges that after substantial completion of the work required pursuant to the contract, SNC was recalled to the job site for additional work at the request of BCC. Filing 165-1 at 5 (¶ 14). The affidavit of Ryan Schaefer, a Vice President of SNC, states that the last warranty

work by SNC on the Project was performed in April 2021. Filing 165-3 at 604 (¶¶ 9-10). BCC disputes that SNC's work was substantially completed. Filing 180 at 3 (¶¶ 13–14).

The parties do not dispute that SNC and BCC executed nine change orders for additional work with BCC increasing its contracted amount from $875,000.00 to a total of $1,025,004.27. Filing 165-1 at 4 (¶ 15). SNC alleges that BCC has paid SNC a total of $999,379.69 leaving an unpaid balance as of June 15, 2020, in the amount of $25,625.11, which has been due and owing from and after June 15, 2020, for work that had been substantially completed in December of 2019. Filing 165-1 at 5 (¶ 16). BCC denies that the work was substantially completed and/or that it was in conformance with the requirements of the subcontract. Filing 180 at 3 (¶ 16).

SNC alleges that Donald O. Heine, the expert witness retained by The Venue to examine, test, and offer opinions regarding the failures to the concrete and the subgrade strata on the Project, has not offered any opinion that attributes any fault to defective grading, compacting, or utility work done by SNC. Filing 165-1 at 6 (¶ 17). In response, BCC reiterates that the concrete parking and drive lanes were defective and that The Venue claims damages to tear out and replace them, including an estimated cost of $163,550 for grading. Filing 180 at 3 (¶ 17) (referring back to its response in ¶ 4).

SNC also alleges that the Project Manager for the Project for BCC, Cory Jackson, testified at his deposition on September 22, 2023, that SNC performed all its work under the contract between SNC and BCC. Filing 165-1 at 6 (¶ 18). SNC alleges further that Jackson's testimony specifically denies the claim by BCC that SNC failed to perform its work pursuant to the contract documents and his testimony specifically stated that SNC performed its work pursuant to the project plans and specifications. Filing 165-1 at 6 (¶ 18). BCC disputes these allegations on the ground that Jackson did not testify "definitively" as SNC suggests, adding that

28

BCC's third-party claim against SNC is conditioned on The Venue's recovery of damages against BCC that are related to SNC's scope of work. Filing 180 at 3 (¶ 18). SNC alleges further that Jackson denied the allegation in BCC's Third-Party Complaint that SNC breached its contract or breached its warranty and that he testified that he was not aware of any deficiencies in SNC's work or that any of SNC's work on the project remained unfinished. Filing 165-1 at 6 (¶ 19). Indeed, SNC alleges that Jackson testified that SNC performed everything pursuant to the plans and specifications. Filing 165-1 at 6 (¶ 19). BCC disputes these allegations in the same way it disputes the prior ones concerning Jackson's testimony. Filing 180 at 3 (¶ 19).

These parties do not dispute that BCC retained Terracon to provide an expert opinion relating to the soils and concrete on the project and presumably to present testimony at trial. Filing 165-1 at 6 (¶ 20). The parties also do not dispute that Terracon stated that its report was offered as a "limited assessment performed to provide an opinion of the pavement relative to observed distress and water seepage, not as an ASTM-compliant in-depth assessment." Filing 165-1 at 6 (¶ 20). These parties do not dispute that Terracon did not identify any defect in the mass grading, fine grading, or site utilities and opined that the reason for the concrete failure may have been related to the types of soils present containing "perched water and fatty clays," which Terracon opined may have contributed to the failure of the concrete in the area. Filing 165-1 at 6–7 (¶ 21). Finally, these parties do not dispute that there is no opinion offered that the mass grading, fine grading, or soil compacting failed to meet the contract specifications. Filing 165-1 at 7 (¶ 21).

2. *The Parties' Arguments*

After setting out Jackson's testimony in more detail, SNC argues that his testimony clearly shows that there is no evidence that SNC failed to perform any of its contractual

obligations. Filing 165-1 at 10. Indeed, SNC contends, there are no genuine issues of material fact as to whether SNC properly completed its work and further performed all requested and required warranty work. Filing 165-1 at 10. Similarly, after setting out Mr. Heine's opinions from his expert report in more detail, SNC argues that Mr. Heine does not offer any opinion to support any claim that SNC's grading operations failed to meet the plans and specifications or that the soil was not properly compacted pursuant to the plans and specifications. Filing 165-1 at 11. SNC acknowledges that the opinion expressed by Terracon indicates that failure of the paving was likely caused by the failure of the subgrade. Filing 165-1 at 11. However, SNC argues that Terracon does not attribute the failure to SNC's grading operations or compacting but instead attributes the failure to the type of the soils and the presence of "perched water." Filing 165-1 at 11. SNC asserts that it was not responsible for soils engineering nor for providing fill for the project, so that Terracon's opinion does not provide any evidence of SNC's alleged failure to perform the contract in compliance with the plans and specifications. Filing 165-1 at 11–12. SNC argues further that none of the defects or problems identified in a HUD Trip Report dated June 18, 2021, are items of work performed by SNC under its contract, further corroborating that SNC performed its contractual obligations, leaving no genuine issues of material fact. Filing 165-1 at 12.

SNC argues that despite this evidence, BCC refuses to make the final payment to SNC as required under the contract. Filing 165-1 at 12. SNC asserts that BCC's reliance on ¶ 12.1 of the contract to withhold final payment is misplaced, as an existing dispute between BCC and The Venue does not involve SNC. Filing 165-1 at 13. SNC argues that ¶ 12.1 does not condition payment to SNC upon payment from The Venue to BCC. Filing 165-1 at 13. SNC also contends that Nebraska law does not allow a general contractor to withhold payment to a subcontractor if

the owner's failure to pay the general contractor is caused by a dispute between the owner and the general contractor that does not involve the subcontractor. Filing 165-1 at 14.

BCC's response is more perfunctory. BCC asserts that The Venue's claim for damages to tear out and replace the parking and drive lanes implicates work done by SNC. Filing 180 at 5. BCC argues that The Venue's expert has opined that the diminution of the market value of the property is $2,690,000, including over $1 million for tearing out and replacing the parking lot and drive lanes. Filing 180 at 5. BCC also contends that Mr. Heine opined that failures related to concrete are generally tied together with multiple scopes of work, particularly compacting issues. Filing 180 at 5. Specifically, BCC argues that Mr. Heine opined that while the subgrade may have been adequately compacted at one time, conditions may have changed by the time the paving was laid down. Filing 180 at 5. BCC argues that because there is a dispute about whether SNC fully performed its work in accordance with the specifications and requirements, SNC is not entitled to direct payment from BCC. Filing 180 at 5–6.

In reply, SNC argues that BCC's assertions of disputed material facts are contrary to the evidence cited by BCC and contrary to other evidence. Filing 189 at 2. SNC argues that there is no evidence offered by BCC to support any allegation that SNC did not fully complete its contract or the work on the Project or that The Venue has made any claim for damages as a result of SNC's performance. Filing 189 at 11.

### 3. BCC Has Failed to Generate a Factual Dispute on SNC's Performance

As explained in § II.B.2., breach-of-contract claims and breach-of-warranty claims require proof of a promise or warranty and breach of that promises or warranty, *i.e.*, a defect. *See Henriksen*, 643 N.W.2d at 658 (explaining that proof of a breach-of-contract claim requires *inter alia* proof of a promise and breach of that promise); *McCoolidge*, 874 N.W.2d 901 (explaining

31

that proof of a breach-of-warranty claim requires *inter alia* proof of a warranty and breach of that warranty). BCC's "indemnity and/or contribution" claim is likewise premised on a "defect" in SNC's work. *See* Filing 45 at 5 (¶¶ 25–27).

The crux of BCC's argument to defeat summary judgment in SNC's favor is that SNC's work is "implicated" in The Venue's claims against BCC. Filing 180 at 4–5. It is important to note that BCC takes the "general position" that all work on the Project was in accordance with the contract plans and specification, but that "in the alternative" BCC is suing the subcontractors whose scope of work is implicated in The Venue's claims. Filing 180 at 4. BCC asserts, "Should there be a finding that [BCC] is liable to The Venue for damages related to SNC's scope of work, [BCC] is entitled to indemnity and/or contribution from SNC." Filing 180 at 4.

The Court concludes that BCC has failed to meet its burden in resisting summary judgment to "'do more than simply show that there is some metaphysical doubt as to the material facts,' and . . . come forward with 'specific facts showing that there is a genuine issue for trial.'" *Jones*, 77 F.4th at 662–63 (quoting *Torgerson*, 643 F.3d at 1042). No reasonable jury could conclude that SNC's work is "implicated" by The Venue's claims against BCC. *See Liberty Ins. Corp.*, 87 F.4th at 888 ("A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" (quoting *Liberty Lobby, In*c., 477 U.S. at 248)).

BCC points to The Venue's allegation that "[t]he concrete parking and drive lanes are defective and unacceptable," Filing 8 at 7 (¶ 21.a.), as implicating SNC's scope of work. Filing 180 at 2 (¶ 4), 5. The Court concludes that the portions of Mr. Heine's deposition testimony cited by BCC are so selective that they provide no more than a scintilla of evidence that work by SNC is implicated. *Johnson*, 88 F.4th at at 736 ("To create a genuine dispute of fact, 'the mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient;

32

there must be evidence on which the jury could reasonably find for the plaintiff.'" (quoting *Anderson*, 477 U.S. at 252)). Specifically, BCC asserts that Mr. Heine testified that pavement issues are tied to compacting issues. Filing 180 at 5 (citing Filing 165-3 at 287 (Depo. of Heine, 189:23–190:23)); *see also* Filing 182-9 (another copy). BCC asserts further that Mr. Heine opined that there are tests that indicate that the subgrade was adequately compacted at one time, but that was just a "snapshot in time." Filing 180 at 5 (citing Filing 165-3 at 287 (Depo. of Heine, 190:24–191:5)). BCC then points to Mr. Heine's testimony as explaining that the tests just provide a background, and since the tests are just a snapshot in time, we do not know the conditions at the time the paving was poured, while test results after damage occurred showed that the subgrade was not properly prepared. Filing 180 at 5 (citing Filing 165-3 at 276 (Depo. of Heine, 145:18-146:15)). Even accepting these statements by Mr. Heine as true, they are insufficient to defeat SNC's summary judgment motion because no reasonable jury could conclude from them that defective grading and defective compacting by SNC were the causes of any defective pavement issues.

Indeed, to the contrary, the testimony by Mr. Heine on which SNC relies to support summary judgment in its favor completely undermines the snippets of his testimony on which BCC relies to try to defeat SNC's summary judgment motion. Mr. Heine did not offer any opinion that the subgrade was improperly cut, filled, or compacted by SNC. Instead, Mr. Heine repeatedly testified that the failure in this instance was that the final 12 inches of subgrade needed to be recompacted and conditioned before the paving was applied, if there had been any weather event or operation of heavy equipment on the subgrade after the completion of grading by SNC. He did not testify that SNC was responsible for such recompacting and conditioning just before paving if the compacting previously tested as adequate. Instead, Mr. Heine discussed

33

causes of pavement failure which may include moisture seepage through bad seals and damaged grading. Filing 165-3 at 266–69 (Depo. of Heine, 106:17–118:24). Mr. Heine explained "We don't know how quickly that paving was placed on top of the approved grade. So we do not know the condition at the time the paving went down," and that evidence of a subgrade that was not properly prepared could be because of significant rain or because it had been driven over with heavy equipment. Filing 165-3 at 276 (Depo. of Heine, 145:18–146:15). Mr. Heine stated that the conditions were not the same at the time of paving as when tested, so "[s]omething had happened," such as weather or heavy equipment damage. Filing 165-3 at 277–78 (Depo. of Heine, 152:22–153:5). Mr. Heine discussed how the subgrade could be "destroyed" by construction work before paving occurred. Filing 165-3 at 285–86 (Depo. of Heine, 183:25–187:20). He also testified, "We have test results that say yes," that the subgrade was adequately compacted at one point in time. Filing 165-3 at 287 (Depo. of Heine, 190:24–191:5).

As a more substantial example, Mr. Heine testified,

> So if the—if the paving contractor were to assume this has been overlot graded, all I have to do is go in, get the grades trimmed down to where it needs to be and put the paving on top of it, that's an incorrect assumption on his part. There needs to be recompaction and moisture conditioning of the top 12 inches immediately before paving.

> * * *

> Q.     When you say immediately, can you define immediately for me? Is that—

> A.     It depends on the conditions. If—you know, if it was a week where there was no rain in the forecast, it wouldn't be unusual that they could get it ready on a Monday and pour on a Friday. But if they were to get it ready and have it tested and say it's ready and then you got a big rainfall event on that, then that subgrade is no good anymore. Now you have to go back in and go through that process again.

> * * *

34

A.    The grader or . . . whoever is responsible for conditioning of that top 12 inches.

Filing 165-3 at 285–86 (Depo. of Heine, 184:23–185:23). He also testified,

It's very common for the subgrade or the dirt grade to get completely destroyed after the rough grading is done by the contractors that are in doing the—building the building, putting in the utilities, doing any number of those things that happen just because they are required to be out there in all kinds of weather conditions. So it's very typical to see multiple feet of that rough grade get entirely destroyed during the construction process.

Q.    As they run big equipment over the top of it—

A.    Big equipment.

Q.    —again rain events that get wet soil, and we know all what happens when you try to drive big huge trucks over wet soil.

A.    Correct.

Filing 165-3 at 286 (Depo. of Heine, 187:4–20); *see also* Filing 165-3 at 287 (Depo. of Heine, 189:4–13 (stating his anticipated expert opinion to be on the pavement subgrade and the condition of the subgrade, specifically, "That top 12 inches . . . of material that needed to be compacted—recompacted and moisture conditioned directly before paving.")). Mr. Heine also testified that some of the pour dates for pavement caused him concern, because "[i]t looked like weather conditions weren't right." Filing 165-3 at 258 (Depo. of Heine, 73:2–5). He added that the test showing compliance with grading requirements of the contract "doesn't tell me what the day before [the pour] looked like, what the four hours before looked like, any of those kind of things." Filing 165-3 at 258 (Depo. of Heine, 73:5–10).

There is no evidence cited by any party that SNC was called back but refused to do regrading or recompacting immediately before paving of the areas where defects occurred, despite delays, weather events, and other construction work between the completion of SNC's grading work and the paving. To the contrary, the evidence from Jackson and Terracon—which

35

BCC has not attempted to rebut—as well as that from Mr. Heine, shows that SNC completed its work according to the construction documents, whatever may have happened subsequently to damage the subgrade prior to paving. Although precisely how much time elapsed between SNC's completion of grading and the pouring of pavement is not clear from the record, BCC has failed to generate genuine issues of material fact on the following matters: (1) when SNC completed its grading work, tests showed that the grading complied with the contract specifications; (2) by the time pavement was poured, conditions had changed and regrading and/or recompaction should have been done; (3) no one called SNC back to the site to do such regrading and/or recompaction except on certain occasions when SNC did perform warranty work, no on otherwise notified SNC that its grading had become inadequate, and no one asserts that SNC was responsible for such regrading and/or recompaction just prior to pouring; and (4) no one attributes the failure of pavement to SNC's work on the project but instead witnesses attribute it to intervening weather conditions, improper soil conditions, construction traffic over previously graded sites, and leakage of pavement seams. The fact that regrading might now be required to remedy the pavement problems after defective pavement is removed simply does not generate a genuine issue of material fact that the grading was not in compliance with contract requirements when SNC completed it before the pavement was originally poured.

Consequently, SNC is entitled to summary judgment on BCC's third-party claims against it, and SNC is also entitled to summary judgment on its counterclaim against BCC for payment of the remaining unpaid balance due of $25,625.11, plus interest, under the subcontract between SNC and BCC. For the same reason, SNC is entitled summary judgment on its Cross Claim against Western for payment of the remaining unpaid balance due of $25,625.11, plus interest.

### D.  MFS's Motion

The last motion now before the Court is MFS's Motion for Summary Judgment on BCC's tenth, eleventh, and twelfth causes of action against MFS in BCC's Third-Party Complaint. Filing 170. As mentioned in the brief summary of factual background in § I.A., MFS was the subcontractor for the Project ultimately hired to install a wet sprinkler system for fire suppression. Filing 173 at 6 (¶ 33). BCC's tenth cause of action is for breach of contract, alleging that MFS's work "did not comply with the Prime Contract or is otherwise defective." Filing 45 at 8–9 (¶¶ 54–60). BCC's eleventh cause of action is for breach of warranty, alleging that MFS breached express warranties "that the work will conform to the requirements of the Subcontract Documents and will be free from defects, expect [sic] those inherent in the quality of the Work the Subcontract Documents require or permit," adding that "[w]ork, materials or equipment not conforming to these requirements may be considered defective." Filing 45 at 9 (¶¶ 61–64). BCC's twelfth cause of action is for "indemnity and/or contribution" from MFS, alleging that "[i]f and to the extent that [BCC] is determined to be liable to The Venue on [T]he Venue's Counterclaim, [BCC] is entitled to indemnification and/or contribution from [MFS] due to [MFS's] obligations under the [MFS] Subcontract, and in accordance with applicable law." Filing 9–10 (¶¶ 65–66).

MFS's Motion for Summary Judgment has two prongs. First, MFS argues that BCC's express or implied acceptance of MFS's work operates as a waiver of any claim of defective performance. Filing 171 at 3–4. Second, MFS argues that BCC's counterclaims against MFS suffer from a failure of essential proof. Filing 171 at 5. The Court will consider in turn these two grounds for summary judgment. Before doing so, the Court sets out a statement of the pertinent facts and factual disputes. Unless indicated otherwise, the facts set out here are undisputed.

*1. Additional Factual Background*

BCC requested bids from subcontractors for the Project. Filing 173 at 3 (¶ 15). MFS received an invitation from BCC to bid on the fire suppression system. Filing 173 at 3 (¶ 16). MFS alleges that a specifications book was provided with the invitation to bid but that the specifications book contained no specifications for a fire suppression system. Filing 173 at 3 (¶ 17). MFS adds that the plans provided for the bid contained virtually no information regarding the desired fire suppression system. Filing 173 at 4 (¶ 18). BCC disputes these two allegations, asserting that the shop drawings for this project called for unheated corridors and that MFS's eventual bid for a fire suppression system did not account for unheated corridors and was for a "wet" system. Filing 179 at 2 (¶¶ 17–18).

The plumbing plans provided with the bid information only provided information regarding where the sprinkler line was to enter the apartment buildings. Filing 173 at 4 (¶ 19). Based on MFS's experience in the industry and its experience building fire suppression systems and multifamily homes in the Nebraska climate, MFS submitted a bid for a "wet" pipe system with some limited exceptions, including a bid for a dry system in the clubhouse only. Filing 173 at 4 (¶ 20). On May 24, 2018, MFS received feedback on its bid by email from Ryan Vetter, a representative of BCC, requesting a price adjustment. Filing 173 at 4 (¶ 21). Ryan Vetter's email did not discuss the actual proposed scope of work for the bid and did not include any request to alter the scope of work. Filing 173 at 4 (¶ 22). MFS responded on May 28, 2018, that it could not adjust its bid to the desired price with the clubhouse dry system included and provided a counteroffer. Filing 173 at 4 (¶ 23). MFS submitted a revised bid on July 26, 2018, with the only change being the slightly lower price that had been negotiated. Filing 173 at 4 (¶ 24). On September 28, 2018, BCC issued a Letter of Intent stating BCC's intent to award MFS the

contract to "supply, design, and install [a] new fire sprinkler system . . . per local and state codes." Filing 173 at 4–5 (¶ 25). The Letter of Intent indicated that it was based on the bid submitted by MFS and requested that MFS prepare submittals. Filing 173 at 4–5 (¶ 25). Beginning November 25, 2018, MFS began submitting design hydraulic calculations and product data to BCC for its review. Filing 173 at 5 (¶ 26). BCC's representative made no comment on the substance of the plan but simply asked if the information had been submitted to the city and the fire department for approval. Filing 173 at 5 (¶ 27). On November 26, 2018, there was further discussion regarding the submittals, as well as discussion of the fact that although MFS had supplied design services per the Letter of Intent, it still did not have a contract from BCC, and BCC responded that the contract was still not completed. Filing 173 at 5 (¶ 28).

MFS alleges that on December 3, 2018, BCC through its project engineer asked for an update as to whether the city had approved MFS's submittals of plans and specifications, and MFS responded that the first two buildings had been submitted and that MFS was in the process of getting the remainder of the submittals to the city for approval. Filing 173 at 5 (¶ 29). MFS alleges that on December 3, 2018, Cory Jackson also sent an email to MFS indicating that the architect was in a conversation with the city regarding removing the sprinkler system from the clubhouse. Filing 173 at 5 (¶ 30). BCC disputes these two allegations on the ground that they lack citations to any evidence to support them, which is accurate. Filing 179 at 2 (¶¶ 29–30).

On December 16, 2018, Cory Jackson sent an email to MFS indicating that the clubhouse fire suppression system was being removed and asking for confirmation of a reduction in contract price. Filing 173 at 5 (¶ 31). On December 28, 2018, Jackson sent an email to MFS again asking about the status of the City of Papillion's review of the shop drawings and product data submittals. Filing 173 at 5 (¶ 32). Jackson indicated in that email that the architect and the

engineers wanted the submittals to the city to be sent to them for their "record only," and added, "So once you have City approval you are clear to proceed." Filing 173 at 6 (¶ 32). On January 11, 2019, BCC and MFS entered into a subcontract agreement that contained a scope of work specifying a wet system installation. Filing 173 at 6 (¶ 33) (citing Filing 172-7). The subcontract between BCC and MFS contained *inter alia* an indemnification clause stating that indemnification is owed "only to the extent caused by the negligent acts or omissions of the Subcontractor" and excludes "the Work itself." Filing 173 at 3 (¶ 12) (citing Filing 172-7 at 8 (§ 4.6.1)).

On January 31, 2019, Jackson sent another email to MFS stating, "Another issue as I dig into the un-heated corridors. The vestibule head on 1st floor is within an uninsulated wall and unheated space. Can this be moved to the middle wall?" Filing 173 at 6 (¶ 35). MFS informed Jackson and BCC that fire suppression pipes could not be insulated and that another solution needed to be found. Filing 173 at 6 (¶ 36); Filing 173 at 6 (¶ 37) (alleging that the fire suppression pipes in the corridor could not be insulated). On February 14, 2019, Jackson requested pricing for proposals for an antifreeze system, and in the alternative, a dry head system for the corridors. Filing 173 at 6 (¶ 38). MFS alleges that at all times, from the point of initial bid forward to the start of construction, BCC was aware of MFS's plan to install a wet pipe system in the apartment building corridors. Filing 173 at 6 (¶ 39). BCC disputes this allegation on the ground that the shop drawings indicated that the corridors were originally planned to be unheated. Filing 173 at 3 (¶ 39). However, BCC does not dispute that the wet pipe system was reflected in all bid proposals that MFS submitted to BCC. Filing 173 at 6 (¶ 40). BCC also does not dispute that the wet pipe system was reflected in all designs and submittals for the apartment

40

buildings that MFS sent to BCC and the City of Papillion prior to the start of construction. Filing 173 at 7 (¶ 41).

Based on the climate of Nebraska a wet pipe fire suppression system cannot be installed in an unheated area. Filing 173 at 7 (¶ 42). MFS alleges that it was unaware of any plan to have unheated corridors on the property until January 29, 2019. Filing 173 at 7 (¶ 43). BCC disputes that allegation on the ground that the shop drawings for this Project called for unheated corridors and alleges that MFS's bid for a fire suppression system did not account for unheated corridors but was for a wet system. Filing 179 at 3 (¶ 43). The parties do not dispute that MFS's work on the Project was inspected and approved by the Papillion Fire Department and inspected and approved by BCC. Filing 173 at 7 (¶¶ 47–48). They also do not dispute that MFS was paid in full for its work on the Project including all retainage. Filing 173 at 7 (¶ 49).

MFS alleges that no party has identified an expert who will testify to any defects in MFS's work. Filing 173 at 7 (¶ 46). BCC disputes this allegation on the ground that The Venue has disclosed an Appraisal Report of its expert, Brian Wilson, MAI, that the diminution of market value of the property is $2,690,000, and that The Venue alleges that its damages include "[t]he cost to change the design of the fire suppression system, which [BCC] calculated was $225,000, and the higher heating costs, currently estimated to be $545,455, due to the installed system." Filing 179 at 3 (¶ 46). BCC's evidence shows only that The Venue objected to the extra costs resulting from a wet sprinkler system, not that The Venue considered that the wet sprinkler system MFS installed pursuant to its subcontract was in any way defective.

## 2. *Express or Implied Acceptance of Work*

### a. The Parties' Arguments

MFS's first argument for summary judgment is that its work on the Project was inspected and approved by the Authority Having Jurisdiction (AHJ) referred to in its subcontract and that MFS was paid in full for its work including all retainage. Filing 171 at 4. MFS argues that it was not required to perform any warranty work. Filing 171 at 4. Under these circumstances, MFS argues that its work was actually or at a minimum impliedly accepted by BCC, so that BCC has waived its right to assert claims of defective performance by MFS. Filing 171 at 4. Indeed, MFS argues that under long-standing Nebraska law, actual or implied acceptance of work generally operates as a waiver of any claim of defective performance. Filing 171 at 4. Thus, MFS argues that based on the undisputed facts, it is entitled to summary judgment as a matter of law. Filing 171 at 5.

BCC argues that the accepted work doctrine does not apply. Filing 179 at 5. BCC argues that this is so because there is no evidence submitted by MFS that The Venue, the owner of the Project, accepted MFS's work. Filing 179 at 5. BCC also argues that the accepted work doctrine does not apply where the defects were latent and unknown to the owner. Filing 179 at 5. Here, BCC argues that there are questions of fact as to whether claimed additional future corridor heating costs were known to The Venue prior to any purported acceptance and that this issue is subject to further discovery. Filing 179 at 5.[3]

---

[3] BCC's assertion that further discovery is required is not cast as, and the Court does not construe it as, a Rule 56(d) motion. *See* Fed. R. Civ. P. 56(d) (stating the procedure "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."). BCC has not remotely met the requirements of Rule 56(d) to obtain further discovery before the Court's disposition of MFS's Motion for Summary Judgment.

In reply, MFS argues that there is no evidence that The Venue rejected MFS's work. Filing 183 at 5. MFS argues further that applicable case law does not support BCC's contention that the owner must accept the work for the accepted work doctrine to apply. Filing 183 at 5. MFS argues that BCC accepted MFS's work and was well aware of MFS's wet system design, as was the owner. Filing 183 at 7. MFS argues that there are no allegations or evidence in this case that there was any latent defect in MFS's work because The Venue's lack of knowledge about what the future corridor heating costs might be does not establish a latent defect. Filing 183 at 7.

        b.   The Accepted Work Doctrine

BCC is correct that a common formulation of the "accepted work doctrine" in Nebraska decisions is set out in *Moglia v. McNeil Co., Inc.*, 700 N.W.2d 608, 619 (Neb. 2005). Filing 179 at 5. That statement is as follows:

> The general rule is that a construction contractor is not liable for injuries or damage to a third person with whom he is not in contractual relation resulting from the negligent performance of his duty under his contract with the contractee where the injury or damage is sustained after the work is completed and accepted by the owner.

*Moglia*, 700 N.W.2d at 619 (quoting *Parker v. Lancaster Cty. Sch. Dist. No. 001*, 579 N.W.2d 526, 528 (Ned. 1999)); *accord Washington v. Qwest Commc'ns Corp.*, 704 N.W.2d 542, 546 (Neb. 2005) (also quoting Parker for this formulation). Nevertheless, BCC's assertion that only acceptance by the owner—in this case, The Venue—permits application of the rule is unavailing.

As MFS contends, the Nebraska Supreme Court has explained, "In *City of Gering v. Smith Co.*, 215 Neb. 174, 337 N.W.2d 747 (1983), we held that an express or implied acceptance of work as in compliance with a building contract operates as a waiver of defective performance." *Lindsay Mfg. Co. v. Universal Sur. Co.*, 519 N.W.2d 530, 540 (Neb. 1994). It also recognized that "this rule is inapplicable where the acceptance was under protest or induced by

43

fraud, or where the defects were latent and unknown to the owner." *Id.* (citing *City of Gering*, 337 N.W.2d at 747). More specifically, the Nebraska Supreme Court explained,

> In [*City of Gering*], the City of Gering hired Smith Company to construct a sewer. Upon completion of the construction, the city's engineer issued a certificate to the city stating that the sewer had been completed in accordance with the terms of the contract. The engineer also recommended that the city accept the work. Pursuant to the engineer's recommendation, the city council accepted the work. Notwithstanding the certification and acceptance, one of the engineers working on the job knew that the sewer had a sag in it. Although the city officials testified that they were unaware of the sag at the time they accepted the work, we held that this did not affect the validity of the waiver. We held that knowledge of the engineer-agent was knowledge of the principal. "If the City intended to object to the work because of the sag, a fact known to the City's engineer, it had to do so before accepting the work in reliance upon its engineer's certificate." 215 Neb. at 180, 337 N.W.2d at 751.

*Lindsay Mfg. Co.*, 519 N.W.2d at 540–41.

In *Lindsay Manufacturing Company*, Lindsay (the owner), a manufacturer of galvanized center-pivot irrigation equipment, retained and contracted with Gilmore (the engineer) to provide design and engineering services and to prepare the plans, specifications, and contract documents for the design and construction of a new disposal facility for hazardous waste. 519 N.W.2d at 535. Lindsay then entered into a contract with Christiansen (the contractor) to construct the facility using the plans and specifications prepared by Gilmore, including four monitoring wells. *Id.* Christiansen in turn orally subcontracted with Layne–Western (the subcontractor) to do the actual digging and installation of the monitoring wells. *Id.* at 536. Gilmore certified that the entire construction project was complete, but Lindsay contends that eleven months later it was informed that contamination of an aquifer was due solely to the wells. *Id.* Lindsay brought various negligence claims against Layne-Western arising from Layne-Western's work on the project as well as claims against Christiansen. *Id.* The jury returned a verdict for Christiansen and Layne-Western. *Id.* at 537.

44

When Lindsay appealed the defense verdicts, Christiansen and Layne-Western cross-appealed the denial of their respective motions for directed verdict at the close of all evidence. *Id.* at 537. On Christiansen's (the contractor's) appeal, the Nebraska Supreme Court "note[d] that Gilmore [the engineer] certified that 'construction of the acid waste treatment facility, including work incidental thereto, has been completed and [the] contract, therefore, has been fully performed in accordance with the plans and specifications. . . .'" *Id.* at 540. The Nebraska Supreme Court "also note[d] that uncontroverted evidence establishes that Lindsay paid Christiansen pursuant to the certificate of payment issued by Gilmore covering the installation of the monitoring wells." *Id.* The Nebraska Supreme Court held,

> [I]f Lindsay was going to object to the construction of the wells, it had to do so before accepting the work in reliance upon Gilmore's certificate. As in *City of Gering*, Lindsay's acceptance of the work operated as a waiver of defective performance. Lindsay has neither pled nor attempted to prove that its acceptance was induced by fraud or was made under protest. In light of Lindsay's express waiver, the trial court should have directed a verdict for Christiansen.

*Lindsay Mfg. Co.*, 519 N.W.2d at 541. Thus, as BCC asserts, the accepted work rule applies to an owner's acceptance of a contractor's work and results in a waiver of the owner's claim of defective work by the contractor. That does not mean that only the owner's acceptance will permit application of the rule, however.

In *Lindsay Manufacturing Company*, on Layne-Western's (the subcontractor's) appeal, the Nebraska Supreme Court again stated, "In Nebraska, the general rule is that one not a party to a construction contract cannot, for injuries received after the acceptance of the completed work by the contractee, maintain an action in tort for the negligent performance of the contract." *Id.* at 542. Thus, *Lindsay Manufacturing Company* formulated the rule in terms of acceptance "by the contractee" rather than in terms of acceptance "by the owner." The court relied on a prior decision, *Stover v. Ed Miller & Sons, Inc.*, 231 N.W.2d 700 (Neb. 1975), in which it held that a

45

subcontractor was not liable for injuries suffered by an employee of the contractor after the subcontractor completed its work and left the jobsite. *Lindsay Mfg. Co.*, 519 N.W.2d at 542. The Nebraska Supreme Court explained that in *Stover* it had affirmed the grant of summary judgment to the subcontractor on the injured employee's claims "finding first that there was no privity of contract between the plaintiff and the defendant [the subcontractor] and second that the defendant had no duty to do the shoring work" during which the plaintiff was injured. *Id.*

The Nebraska Supreme Court then explained that in Lindsay's case against Layne-Western,

> [I]t is undisputed that Lindsay hired Gilmore to design the well and to oversee its construction. Moreover, Gilmore was contractually obligated to observe the applicable laws, many of which were drafted in order to prevent the contamination of ground water. That Gilmore failed to design a well that would prevent contamination does not impose additional responsibilities upon Layne–Western. Layne–Western contractually agreed with Christiansen to build four monitoring wells for $10 a foot. Given the limited evidence of the oral contract Layne–Western had with Christiansen, it cannot be said that Layne–Western had the extensive duties which Lindsay alleges Layne–Western had. Since as discussed in the previous section, the work performed was accepted, Lindsay cannot maintain an action for the negligent performance of a contract against Layne–Western.

*Lindsay Mfg. Co.*, 519 N.W.2d at 542. Thus, "accepted work," even if accepted only by the contractee (the general contractor, in that case, Chrisiansen) with the subcontractor (in that case, Layne-Western), precludes a claim by any third party including the owner (in that case, Linsday) against the subcontractor (in that case, Layne-Western).

The decision in *Moglia* on which BCC relies is not to the contrary, because application of the accepted work doctrine in that case involved only acceptance of a contractor's work by the owner as barring negligence claims against the contractor by a subsequent homeowner. *See Moglia*, 700 N.W.2d at 619. In other words, in *Moglia* the "contractee" was also the "owner." *Cf. Lindsay Mfg. Co.*, 519 N.W.2d at 542 ("In Nebraska, the general rule is that one not a party to a

46

construction contract cannot, for injuries received after the acceptance of the completed work by the contractee, maintain an action in tort for the negligent performance of the contract.").

Turning to the "latent defect" exception to application of the accepted work rule, in *Moglia*, the Nebraska Supreme Court explained, "This court has recognized an exception to the accepted work doctrine in situations where . . . the defect at issue was latent and could not have been discovered by the owners or employer." *Moglia*, 700 N.W.2d at 619 (quoting *Parker*, 579 N.W.2d at 528). A defect in construction is not "latent" if it was "in plain view and could have been seen." *Delicious Foods Co. v. Millard Warehouse, Inc.*, 507 N.W.2d 631, 638 (Neb. 1993). Instead, the defect must be one that was "not reasonably discoverable by the owner." *Erickson v. Monarch Indus., Inc.*, 347 N.W.2d 99, 106 (Neb. 1984).

c. The Accepted Work Doctrine Bars BCC's Counterclaims Against MFS

Application of the accepted work doctrine here is informed by *Lindsay Manufacturing Company* not *Moglia*. Specifically, "In Nebraska, the general rule is that one not a party to a construction contract cannot, for injuries received after the acceptance of the completed work by the contractee, maintain an action in tort for the negligent performance of the contract." *Lindsay Mfg. Co.*, 519 N.W.2d at 542. Here, the contractee was the general contractor, BCC, and the subcontractor for the fire suppression system was MFS, just as in *Lindsay Manufacturing Company*, the contractee was the general contractor, Christiansen, and the subcontractor for the monitoring wells was Layne-Western. *Id.* at 536. The undisputed record evidence is that MFS's work on the Project was inspected and approved by the Papillion Fire Department and inspected and approved by BCC. Filing 173 at 7 (¶¶ 47–48). The undisputed evidence is also that MFS was paid in full for its work on the Project by BCC including all retainage. Filing 173 at 7 (¶ 49). Thus, in this case, the undisputed evidence of acceptance of MFS's work by BCC, the

contractee, means that as a matter of law BCC has waived any claim against MFS for defective performance. *Lindsay Mfg. Co.*, 519 N.W.2d at 541 ("Lindsay's acceptance of the work operated as a waiver of defective performance" by the contractor, Christiansen). Furthermore, The Venue is also barred from pursuing any claim against MFS because BCC, the contractee, accepted MFS's work, and The Venue, as the owner and a non-party to the BCC–MFS subcontract, cannot maintain an action for the negligent performance of the subcontract against MFS. *Id.* at 542 ("Since as discussed in the previous section, the work performed was accepted [by Christiansen, the contractee with Layne-Western], Lindsay [the owner] cannot maintain an action for the negligent performance of a contract against Layne–Western.").

BCC's argument that a latent defect in this case precludes application of the accepted work doctrine is also unavailing. *See Moglia*, 700 N.W.2d at 619 (identifying a "latent defect" as an exception to the accepted work rule). Here, it is undisputed that based on the climate of Nebraska a wet pipe fire suppression system cannot be installed in an unheated area. Filing 173 at 7 (¶ 42). It is also undisputed that the wet pipe system was reflected in all bid proposals that MFS submitted to BCC, Filing 173 at 6 (¶ 40), and in all designs and submittals for the apartment buildings that MFS sent to BCC and the City of Papillion prior to the start of construction, Filing 173 at 7 (¶ 41). Thus, the fact that the corridors needed to be heated to accommodate the wet pipe system was well-known to BCC and was certainly discoverable upon reasonable review of the construction documents by The Venue. *See Moglia*, 700 N.W.2d at 619 (explaining that a latent defect must not have been discoverable by the owners or employer); *Delicious Foods Co.*, 507 N.W.2d at 638 (explaining that a construction defect is not "latent" if it was "in plain view and could have been seen"); *Erickson*, 347 N.W.2d at 106 (explaining that a defect is latent only if it is "not reasonably discoverable by the owner").

MFS is entitled to summary judgment on BCC's counterclaims against it because those claims are barred by the accepted work doctrine. Nevertheless, the Court will consider in the alternative MFS's argument that it is entitled to summary judgment on BCC's counterclaims for failure of essential proof.

### 3. Failure of Essential Proof

#### a. The Parties' Arguments

MFS asserts that BCC has failed to establish or generate a factual dispute that there was any flaw in MFS's design or execution of that design for the fire suppression system, so that BCC's claim fails for lack of essential proof of the "defect" element of its claims. Filing 171 at 6–7. More specifically, MFS argues that no party has disclosed any expert opinion that MFS's work or its design of the fire suppression system was defective or provided a rebuttal opinion to MFS's own expert's opinions. Filing 171 at 6. Indeed, MFS argues that there is no expert testimony that disputes that the design necessarily had to be changed to add heat to the corridors because of the climate in Nebraska, not just for the fire suppression system but also for other plumbing. Filing 171 at 6. Finally, MFS contends that no party has disclosed any expert opinion that the accepted fire suppression system had any defects, patent or latent. Filing 171 at 6.

BCC responds that there is a genuine issue of material fact as to whether MFS's work was defective. Filing 179 at 3. BCC again takes the "general position" that all work on the Project was in accordance with the contract plans and specification, but that "in the alternative" BCC is suing the subcontractors whose scope of work is implicated in The Venue's claims. Filing 179 at 3–4. BCC asserts, "Should there be a finding that [BCC] is liable to The Venue for damages related to MFS's scope of work, [BCC] is entitled to indemnity and/or contribution from SNC." Filing 179 at 4. BCC argues that The Venue's claims clearly involve the scope of

MFS's work, because The Venue claims damages for the cost to change the design for the fire suppression system from a dry pipe system to a wet pipe system and the higher heating costs for the heated corridors required by a wet pipe system. Filing 179 at 4. BCC argues that MFS submitted a bid for a wet system as opposed to a dry system that The Venue had requested, where the buildings were designed not to have conditioned air in the corridors. Filing 179 at 4. BCC also contends that the shop drawings for this Project called for unheated corridors. Filing 179 at 4. Interestingly, BCC then argues that in the construction industry it is common for architects and engineers, who do not have expertise in fire suppression, not to review the designs submitted by contractors, such as MFS. Filing 179 at 4. BCC asserts that the numerous change orders to add heat to the corridors involved considerable extra expense, although BCC states that it is not clear whether that extra expense was $35,000 as BCC states or $225,000 as BCC suggests The Venue claims. Filing 179 at 4.

In reply, MFS argues that there is no expert testimony to support BCC's claims of a defect in the fire suppression system, which required heated corridors. Filing 183 at 2–3. MFS also argues that no evidence has been produced to support The Venue's bare allegations of damages because the fire suppression system installed was a wet pipe system requiring heated corridors. Filing 183 at 3.

    b.  There Is No Evidence that the Fire Suppression System Was Defective

As explained in § II.B.2., breach-of-contract claims and breach-of-warranty claims require proof of a promise or warranty and breach of that promises or warranty, *i.e.*, a defect. *See Henriksen*, 643 N.W.2d at 658 (explaining that proof of a breach-of-contract claim requires *inter alia* proof of a promise and breach of that promise); *McCoolidge*, 874 N.W.2d 901 (explaining that proof of a breach-of-warranty claim requires *inter alia* proof of a warranty and breach of that

50

warranty). BCC's "indemnity and/or contribution" claim is likewise premised on a "defect" in MFS's work. *See* Filing 45 at 9–10 (¶¶ 65–66).

The crux of BCC's argument to defeat summary judgment in MFS's favor on the alternative ground of failure of essential proof is that MFS's work is "implicated" in The Venue's claims against BCC. Filing 179 at 4. BCC points out that in answer to an interrogatory by another party, The Venue alleged that its damages include "[t]he cost to change the design of the fire suppression system, which [BC] calculated was $225,000, and the higher heating costs, currently estimated to be $545,455, due to the installed system." Filing 179 at 4 (quoting The Venue Answer to Grand Rapids Poured Walls' Interrogatory No. 8 at ¶ 9). Again, the Court points out that BCC's evidence shows only that The Venue objected to the extra costs resulting from a wet sprinkler system, not that The Venue considered that the wet sprinkler system MFS installed pursuant to its subcontract was in any way defective.

The Court concludes that BCC has failed to meet its burden in resisting summary judgment to "'do more than simply show that there is some metaphysical doubt as to the material facts,' and . . . come forward with 'specific facts showing that there is a genuine issue for trial.'" *Jones*, 77 F.4th at 662–63 (quoting *Torgerson*, 643 F.3d at 1042). No reasonable jury could conclude that MFS's work is defective. *See Liberty Ins. Corp.*, 87 F.4th at 888 ("A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" (quoting *Liberty Lobby, In*c., 477 U.S. at 248)). This is because BCC has pointed to nothing rebutting MFS's expert's testimony that a wet pipe system requiring heated corridors was appropriate for the local climate and to satisfy National Fire Protection Association (NFPA) standards. Filing 186-1 at 4 (¶¶ 23–26). BCC has also pointed to nothing rebutting evidence that BCC's project manager recognized the issue with heated corridors, that every submittal MFS

provided was for a wet pipe system, and that the subcontract ultimately required a wet pipe system. Filing 186-1 at 5 (¶¶ 31–35, 38–41, 46–48); *see also* Filing 173 at 6 (¶ 33) (stating the undisputed fact that on January 11, 2019, BCC and MFS entered into a subcontract agreement including a scope of work that specified installation of a wet fire suppression system). BCC also did not dispute any of MFS's factual statements concerning the negotiation over the requirements for the fire suppression system involving a wet pipe system and heated corridors. Filing 173 at 4–5 (¶¶ 20–28). Indeed, BCC does not dispute that the wet pipe system was reflected in all bid proposals that MFS submitted to BCC and in all designs and submittals for the apartment buildings that MFS sent to BCC and the City of Papillion prior to the start of construction. Filing 173 at 6–7 (¶¶ 40–41). The fact that the original shop drawings called for unheated corridors, Filing 183 at 2 (¶ 18), 39 (¶¶ 39, 43), does nothing to generate a genuine issue of material fact on a defect in construction as not in conformance with the contract when the final subcontract between BCC and MFS provided for a wet pipe system that necessarily required heated corridors. Filing 173 at 6 (¶ 33).

Furthermore, BCC does not dispute that MFS's work on the Project was inspected and approved by the Papillion Fire Department and inspected and approved by BCC. Filing 173 at 7 (¶¶ 47–48). Likewise, BCC does not dispute that MFS was paid in full for its work on the Project including all retainage. Filing 173 at 7 (¶ 49). There is also no evidence that MFS was ever required to do any warranty work to resolve any defect. *See* Filing 172-2 at 4 (Mahoney Aff., ¶ 36) (averring that "[n]o warranty work was required from [MFS].").

Thus, MFS is entitled to summary judgment as a matter of law because BCC, the non-moving party, has failed to make a sufficient showing of the existence of an essential element of its case, that is, that MFS's work was in any way defective. *Whitworth*, 90 F.4th at 1217 ("The

movant is entitled to judgment as a matter of law 'when the [non-moving party] has failed to make a sufficient showing of the existence of an essential element of [its] case." (quoting *Andrews*, 98 F.3d at 1074)).

### III. CONCLUSION

Upon the foregoing,

IT IS ORDERED as follows:

1. The Venue's Motion for Partial Summary Judgment, Filing 166, is denied

a. in its entirety on The Venue's first, second, and third causes of action alleging breach of contract, breach of warranty, and construction defects, respectively, in The Venue's Counterclaim, Filing 8, whether based on allegedly nonconforming plumbing fixtures or on an allegedly defective sanitary sewer system; and

b. on The Venue's Third-Party Complaint against Western's Bond, Filing 10.

2. SNC's Motion for Summary Judgment, Filing 165, is granted

a. on BCC's first, second, and third causes of action against SNC in BCC's Third-Party Complaint, alleging breach of contract, breach of warranty, and indemnity and/or contribution, Filing 45; and

b. on SNC Counterclaim against BCC and Cross Claim against Western for payment of the remaining unpaid balance due of $25,625.11, plus interest, Filing 72.

3. MFS's Motion for Summary Judgment. Filing 170, is granted on BCC's tenth, eleventh, and twelfth causes of action against MFS in BCC's Third-Party Complaint, alleging breach of contract, breach of warranty, and indemnity and/or contribution, Filing 45.

4. The following claims remain at issue in this lawsuit:

a.      BCC's three claims against The Venue in BCC's Complaint, Filing 1, which were not at issue in this ruling;

b.      The Venue's five counterclaims in its Counterclaim, Filing 8, and The Venue's single claim against Western's Bond in its Third-Party Complaint, Filing 10; and

c.      SNC's fourth through sixth causes of action against R2 Plumbing and its seventh through ninth causes of action against Grand Rapids Poured Walls, Inc., d/b/a Cherry Valley Concrete, in SNC's Third-Party Complaint, Filing 45.


Dated this 28th day of June, 2024.

BY THE COURT:

Brian C. Buescher
United States District Judge